MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Elizabeth G. and David G. to their four and one half year old daughter, Chloe G. It recounts the story of a well meaning but very limited mother and a misguided and anti-social father and their relationship to this bright, attractive and energetic child. Chloe was removed from the care of her parents when she was not yet a year old after charges that the parents entered into a suicide attempt. This they allegedly attempted to carry out in their vehicle while Chloe was in the car in the family's closed garage with a pipe from the vehicle's exhaust system feeding into the car. Subsequently, her father was incarcerated due to charges stemming from this incident and other criminal matters then pending. Chloe was committed to the care of the Department of Children and Families (hereafter the "Department") on March 31, 1994. She has been in various foster homes since that date. Her present foster parents are closely bonded to her and she to them. They wish to adopt her.
As a preliminary issue, the biological mother has raised an issue concerning her Native American heritage, reporting that her grandmother may have been a member of the Narragansett or Micmac tribes. The Petitioner contacted the Department of the Interior, Bureau of Indian Affairs, and then contacted the two tribes in question. A negative response was received from the Narragansetts and no response from the Micmacs. Although the mother did not make any such claim, the testimony raises the question of the applicability of the provisions of the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. § 1901-1963. Because of the interests CT Page 11201 of Native American peoples in preserving their families and their unique heritage, the act provides that a child's tribe be given notice of an involuntary proceeding and provided the right to intervene. The threshold question therefore raised: is Chloe, by virtue of her ancestry, an "Indian child" as defined in the ICWA? An Indian child is:
 "any unmarried person under the age of eighteen and who is either (1) a member of an Indian Tribe or (2) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903
(4).
The evidence has established that Chloe is not a member of the Narragansett tribe nor do her parents claim to be members of an Indian tribe or living in an Indian community. A "tribe" is further defined as "any Indian tribe, band, nation or other organized group or community of Indians recognized as eligible for services provided to Indians by the Secretary (of the Interior) because of their status as Indians." 25 U.S.C. § 1903
(8). The list of such tribes is published annually in the Federal Register and the Micmac tribe is not so recognized.[2]
Thus, the Micmacs' failure to respond or even their response would not bring this matter within the ambit of the statute.
While no issues with respect to notice were specifically raised by the parties, the court notes that the ICWA notice provisions apply not only when there is an Indian child involved in a custody proceeding, but also when the court has "reason to know that an Indian child is involved." 25 § U.S.C. § 1912 (a). As a consequence, in any case where such information is available to the Department, notice by registered mail, return receipt requested of the proceedings as well as the tribe's right to intervene is required. 25 U.S.C. § 1912 (a). In re JessicaT., 1993 Ct. Sup. 10376 (1993), see also IN RE M.C.P.,572 A.2d 627 (Vt. 989). As some tribes also provide for membership to any descendants of members regardless of the degree of blood relationship,[3] the notice provisions should be followed in all cases where Native American ancestry is raised by any party. To complicate the picture even further, some tribes do not require enrollment to consider a child an "Indian child".
Having reviewed the ICWA provisions, the facts of the child's heritage, the parent's relationship to any tribe as well as the response to the notices provided, the court concludes that the CT Page 11202 ICWA does not apply to these proceedings.
The court finds that the mother and father have appeared and have court appointed attorneys. The court has jurisdiction in this matter; there is no pending action affecting the custody of Chloe in any other court and reasonable efforts have been made to reunite Chloe with her mother. No such efforts were made with respect to her father due to his incarceration.
At the conclusion of the trial, the Department proceeded against the father on the grounds of abandonment, failure to rehabilitate and on the lack of an ongoing relationship with his daughter. Connecticut General Statutes § 17a-112 (c) (3) (A), (B) and (D). It proceeded against the mother on the grounds of failure to rehabilitate and no on-going parent child relationship. Connecticut General Statutes § 17a-112 (c) (3) (B) and (D). The allegations of omission or commission as against both parents as of the adjudicatory date of August 15, 1996 were specifically abandoned by the Department.
The court, having read the verified petitions, the social studies, and the various documents entered into evidence, and having heard the testimony of various witnesses and evaluators, makes the following factual findings:
With Respect to the Child's Father: (David G.)
This child's father is thirty-four years old and has been incarcerated for most of his daughter's short life. David G. has had some considerable involvement with the criminal justice system with nine arrests in twelve years. There have been convictions for arson in 1984, two counts of risk of injury to a minor in 1986, as well as a conviction for assault in the third degree in 1991. He has spent time incarcerated on four occasions, but until the most recent offense, he had never been incarcerated for any substantial period of time. (Petitioner's Exhibit 11). In 1994, on March 18, he was arrested and charged with risk of injury to his daughter. At that time there was a violation of probation charge pending for his conviction of assault in the third degree, for which he had received a suspended sentence, as well as other criminal charges. While David G. continues to deny that a suicide pact had been entered into between his wife, Elizabeth, and himself, it appears he was then despondent over the possibility of a term of incarceration. He did receive a sentence of ten years, execution suspended after five years and CT Page 11203 has been incarcerated since early 1994, when his daughter was not yet a year old.
Prior to David G's present term of incarceration, he resided on an isolated farm with his father, where his wife, Elizabeth, continues to reside. There are dogs at the home, cats and other animals kept at the farm. During his daughter's first year of life, there were reports that David G. used poor judgment in dealing with Chloe. On one occasion, he took her for a ride on his snowmobile after which she was treated for frostbite, the existence of which he denied. On another, he was seen to throw her roughly into the back of his truck while in her infant seat. At yet an earlier time, he fed her ice cream, apparently not understanding that this was inappropriate for a very young infant. He was distrustful of those in authority and required total loyalty from his wife. At that time, the Visiting Nurse Association and other professionals were involved with assisting with the care of this child. David G. was against any such involvement in his family life and resisted these efforts. A parent aide was indicated for the home and it was determined not to provide one due to his hostility and the belief that such a worker would not have been safe, given his attitude.
Since before Chloe's first birthday in 1994, David G. has not seen his daughter nor had any contact with her. He has sent a number of cards and gifts. While he continues to have regular weekly telephone contact with Elizabeth, he has never called the Department to inquire about Chloe's welfare, nor requested except once an administrative case review concerning treatment plans for Chloe. He has declined to take the steps necessary to have visitation with his daughter. It also appears that while incarcerated he did not participate in any counseling or programs which might assist in his rehabilitation. Initially, after his refusal to participate in a court ordered evaluation, his visitation rights were suspended (3/24/95 Dranginis, J.) After completion of the evaluation, he never petitioned to have his access rights restored and stated that he did not want visitation while incarcerated. No expectations were set as to David as he made it clear that such efforts were not welcomed by him.
Dr. Mantel initially evaluated David G. Later, he was also evaluated by Dr. Sadler. The father's own expert, Dr. Nelken, also testified as to his conclusions. The first evaluation was performed by Dr. Mantell and completed on July 27, 1994 (Petitioner's Exhibit 2). He found "an emotionally unstable man CT Page 11204 of below average intellectual functioning. . . . He has a substantial history of both juvenile and young adult offenses, of school difficulties, problems in the community and legal difficulties as well." At that time Dr. Mantel recommended that nothing but the most carefully supervised and brief visitation contact be allowed until a full assessment had been completed and until "there is reason to believe that his psychological status has substantially stabilized."
Dr. Mantel's last contact with the father was on December 4, 1995. At that time he found that the father's "presentation on multiple occasions as well as his history raise strong questions about the adequacy of his judgment, about impulse control difficulty and about the likelihood of his ability to discharge a parenting responsibility" (Petitioners Exhibit 3, page 9). He concluded at the time of trial that David G. was not able to parent Chloe due to his history of personality problems, legal difficulties, emotional instability and poor judgment. He also noted that this parent had not taken any steps to rehabilitate himself and to achieve any understanding of the problems which brought him to this point.
 Dr. Sadler, after evaluating David G. on February 21, 1997 found: "an intellectually limited, smoothly sociopathic, impulsive man with impaired judgment. Mr. G. has pleasant interpersonal skills, a paranoid view of the world and no expressed insight into the nature of his interpersonal interactions, his parenting deficit nor his wife's intellectual and parenting difficulties. Mr. G. does not acknowledge the emotional or developmental needs of his child. . . . Mr. G. has a personality disorder that has been present for many years . . . ." (Petitioner's Exhibit 7, page 5).
He further stated that he did not treat any information provided by Mr. G. as reliable and that in his opinion, Mr. G. "did what he wanted to do". "He did not inhibit his desires to provide a safe and stimulating environment for this child." Both Dr. Sadler and Dr. Mantel found that there was no longer any relationship between Chloe and her father. The department workers noted that she has no memories of him.
Even Dr. Nelkin, father's expert, found him to suffer from antisocial personality disorder. He eloquently outlined the significant needs many adopted children experience as they become adults to know their family of origin. He stated that the CT Page 11205 adoption process "in a general way raises agonizing questions that continue throughout the life of an individual . . ., questions about identity and the nature of their very being". He also found that if the child, Chloe, were returned to her parents, "her situation would not be ideal". His recommendation was essentially a "wait and see" attitude for a child who has been without permanency for some years.
David G.'s aunt testified to her contact with her nephew and his wife during the first year of Chloe's life. She did not note anything other than reasonable parenting efforts by both David and Elizabeth G.
Incarceration of a parent presents a major hurdle for any parent who wishes to maintain contact with a child. Nonetheless, the court has previously held that "the incarceration of a parent does not alone constitute abandonment". In re Juvenile Appeal
(Docket No. 10155), 187 Conn. 431, 443, 446 A.d. 808 (1982); Inre Juvenile Appeal (84-6) 2 Conn. App. 705, 711, 483 A.d. 1101 (1984) cert. denied, 195 Conn. 801, 487 A.d. 564 (1985). "The restrictions on movement that are inherent to incarceration, however, do not excuse a failure to make use of available, albeit limited, resources for communication with one's children." In reJuvenile Appeal (Docket No. 10155), supra In Re Shannon
S., 41 Conn. Sup. 145, 153, 562 A.d. 79 (1989).
However difficult, some of the obligations of parenthood can be pursued, even from prison. "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; . . ." In re Juvenile Appeal (Docket 9489), 183 Conn. 11,15, 438 A. d. 801 (1981) quoting In re Adoption of Webb, 14 Wash. App. 651,657, 544 P.2d 130 (1975). This court finds by clear and convincing evidence that the father took no concerted action to maintain his early relationship with Chloe; he did not communicate with her, he did not provide guidance, he did not express concern. The efforts that did occur were ineffectual. David G. has not gained any insight into the myriad problems that he and his wife had while they were together in attempting to parent Chloe. Chloe has no relationship with him, nor he with Chloe. The court holds that David G. has, by his conduct, effectively abandoned his daughter within the contemplation of Connecticut General Statutes § 17a-112 (c) (3) (A). As a further consequence of his actions, there is no ongoing CT Page 11206 parent-child relationship, pursuant to Connecticut General Statutes § 17a-112 (c) (3) (D).
Further, this child has been adjudicated neglected and the father has failed to achieve such a degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112 (c) (3) (B). Rehabilitation, as used in the statute, refers to the restoration of an individual to a constructive and useful role as a parent.In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986). The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than he was at the time of the commitment. In re Chloe M., 29 Conn. App. 112, 126, 614 A.2d 832
(1992). The court must also consider whether the age and needs of the child support the allowance of additional time for the parent to rehabilitate. In re Luis C., 210 Conn. 157, 167-68,554 A.2d 722 (1989). In this case, David G. has made no efforts to rehabilitate himself as a parent. His lack of insight into his own past and his wife's needs and limitations make future rehabilitation unlikely at best. Dr. Mantel stated the situation succinctly and the court so finds by clear and convincing evidence. "This child has a well defined need for stability in her life which cannot be reconciled with her parents' need to forge a family life. She does not have any more time for her parents to structure their lives."
With Respect to the Mother: (Elizabeth G.)
Like her husband, Elizabeth G. suffers from significant intellectual impairment. She has never held a job and is receiving social security disability payments. She is thirty-three years old and has lived on a farm with her father-in-law for nine years. Her own childhood was difficult. Her parents were alcoholic and largely unable to provide care for her. She assumed child care and household responsibilities while still a child herself. She reported being sexually abused by a relative from the ages of ten to the age of twenty-six. She had been in a relationship with her husband, upon whom she is dependent, for some years prior to Chloe's birth. After her birth, she and David married.
During the first year of Chloe's life, Elizabeth G. required CT Page 11207 the services of the VNA and other help to parent this child. The unclean and chaotic home circumstances, even after her husband had been incarcerated and the child removed, made it necessary that visitation at the home be curtailed. Elizabeth was unable, despite offers of assistance, to maintain a clean home in which a small child could play. There were dirty dishes in the sink, cat hair everywhere including on the curtains and in the child's diaper when she was changed there. On one occasion there were dead mice and dog feces in the home. The level of filth and disorganization was unacceptable and not safe for a small child.
Chloe was first placed with a relative. After Elizabeth came to remove the child, the Department secured an order of temporary custody and shortly thereafter on March 21, 1994, Chloe was adjudicated neglected.
Due to the Department's determination that her home was not proper for visitation, Elizabeth's visitation was restricted to the Department offices or other approved locations and has been supervised. Department workers have noted such visits are controlled by Chloe and that her mother is unable to structure the visits in a normal adult-child manner. During visits, Elizabeth often used food to distract Chloe from actions she wishes her not to take. She seems unable to set limits or impose consequences if the child acts out. On several occasions the social worker notes that Chloe's style of play becomes disorganized after the initial period of the visit. Chloe then begins to act out aggressively against her mother. Observers note a relationship that appears to be one of two peers rather than an adult-child relationship. When questioned whether this was common in the artificial supervised setting for visitation that is what the Department is able to provide, Dr. Mantel reported "no, it is rare." Dr. Philips, Elizabeth's own expert, reported that Elizabeth
 "is able to function adequately in structured and predictable situations, her capacity of making sense of novel, complex, or ambiguous experiences is limited, and she is apt to rely upon over-learned and familiar paradigms for responding. This limitation inhibits her ability to learn from frustration or failure or to be flexible in responding to situations". (Respondent Mother's exhibit A, Page 3).
Some events which occurred during visitation reflect these limitations. During one visit, Chloe punched a hole in her juice CT Page 11208 container with a pencil and continued to drink from it without her mother's intervention. On another, Chloe climbed into an open window in a room two stories from the ground and her mother took no action to stop her until the department intervened. During an outing at Mt. Tom, Elizabeth dunked the child's head under the water and left her unattended later at the water's edge. She could not understand why she could not go swimming. When the problems with this conduct were pointed out to her, she was unable to understand what was wrong and shortly afterwards again went in to the water with her child and pushed her head under water. Elizabeth also reported that when the child was under a year old, a hutch fell near her, and she had made the child go into her room for a one hour time out, a discipline not appropriate for the age of this child. While she attended six parenting classes, she was unable to translate the information provided to her into changes in her behavior toward and dealings with her daughter.
After her daughter's commitment, consistent with the Department expectations, Elizabeth attended counseling. Such counseling was for the purpose of dealing with the issues leading to the removal of Chloe from her care. Instead, the sessions were exclusively about her relationship to her husband and his incarceration. All observers note that Elizabeth is very committed to her husband, dependent on him and remains staunchly loyal to him. She explains all problems away and denies she has any difficulty in providing care for Chloe. As observed by Dr. Sadler:
 "She copes with her stress and her functional limitation by attempting to deny her impairments. In my opinion, this is the intersection of the personalty characteristics and intellectual limitations of Mrs. G which allowed her to fail to respond to her daughters' needs, to fail to protect her daughter from the disorganization of the household and fail to provide the direct physical care needed to protect her daughter". (Petitioner's Exhibit 6, Page 6).
When asked what would be required to permit Elizabeth to parent her daughter, Dr. Mantell replied that "she could do so if she had a supportive person in the household to provide nurturing guidance and structure as well as parenting assistance." What kind of a person is this other than a fully functioning mother, able to parent both Elizabeth and Chloe? Unfortunately, such assistance is not possible in the world we inhabit and Elizabeth CT Page 11209 has been and remains unable to parent this child. And therein lies the central tragedy of this family. Elizabeth's combination of limitations and emotional difficulties are such that she is neither able to adapt to this bright and energetic child nor to respond to the ever changing kaleidoscope of circumstances this child's exploration of her world requires.
With Respect to the Child: (Chloe G.)
Chloe has had some difficult times while in foster care. When she was initially committed, she was found to have significant development delays. With intervention, those lessened and she is now developmentally on target. (Petitioners Exhibit 6, Page 7). Dr. Sadler, when questioned about these delays, stated he believes Chloe's early history of poor caretaking contributed to these delays. His belief is based on the fact that Chloe made such rapid progress when removed from her parents and that there were no physical reasons for those delays. All those who evaluated her found her to be a bright, pretty, and energetic young child who was able to cooperate at appropriate age levels with her evaluators. At present, Chloe is doing well. The child responds to her foster mother and is clearly bonded to her. Her foster mother is able to provide structure, set boundaries and to nurture her. Chloe also has a special connection to her foster father who spends much time with her and to whom she is also bonded. The love and affection her foster mother has for Chloe shone through her every word and gesture during her testimony before the court. Her foster family is eager to adopt her.
Adjudication
With regard to the statutory grounds for termination of parental rights of the father, David G., the court finds by clear and convincing evidence that he has failed to support this child or manifest any reasonable parental interest, whatsoever, and has abandoned her as that term is defined in Connecticut General Statutes § 17a-112 (c) (3) (A). Further, this child has been adjudicated neglected and the father has failed to achieve such a degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112 (c) (3) (B). As the father has not had contact with Chloe for several years and had made no realistic effort to establish any contact, the court finds by clear and convincing evidence that there is no CT Page 11210 ongoing parent child relationship pursuant to Connecticut General Statutes § 17a-112 (c) (3) (D).
Based on the clear and convincing evidence produced at trial, the court finds that the mother, Elizabeth G., has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112 (c) (3) (B). While Elizabeth is well intentioned and has attempted to comply with the expectations set for her, her limitations and emotional deficits make such rehabilitation extremely unlikely and this child cannot wait any longer, given her age. See supra, In reChloe M., 29 Conn. App. 112, 126, 614 A.2d 832 (1992) and In reLuis C., 210 Conn. 157, 167-68, 554 A.2d 722 (1989). Unfortunately, although Elizabeth has visited with Chloe whenever permitted, all observers note that there is no on-going parent child relationship. Elizabeth appears at times "to be going through the motions" and is unable to relate to her child as a parent and the court so finds by clear and convincing evidence.In re Jessica M., 217 Conn. 459, 463, 586 A.2d 597 (1991).
REQUIRED FINDING
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by the Department of Children and Families, including counseling, transportation assistance, and visitation coordination. In the father's case, such direct services have included one administrative case review. Further services were not sought by him. The services offered to the mother were extensive and included significant visitation coordination, counseling and assistance.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father, due to his incarceration and other circumstances relating to the child, did not have or seek visitation and did not avail himself of such opportunities which were open to him to maintain reasonable contact with the child. The mother received ongoing CT Page 11211 and significant services for reunification, but the mother was unable to rehabilitate herself.
3) The Department, with the approval of the Court, set reasonable and realistic expectations and service agreements in order to reunify the family. None were set for the father due to his incarceration and the nature of his crime. Nonetheless, within the appropriate limits set by the court, he failed to take advantage of those opportunities that he did have open to him. The expectations set for Elizabeth G. were both reasonable and realistic. She was unable to benefit from parenting education and personal counseling due to her own focus on her relationship with her husband to the exclusion of her child. As noted by counsel for the minor child, the facts of the father's incarceration and her loneliness have propelled the mother and father together over these past years and in so doing, they have pushed their child away.
4) The child has strong emotional ties with the foster family who have provided the physical, emotional and educational support this child needs. The evidence has clearly established the close and rich bond with the foster family. The child has no emotional ties to the biological father and only limited ties to her mother.
5) Finding regarding the age of the child. Chloe is four years and six months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return her to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. The father has done nothing to adjust his circumstances while incarcerated to make it in the best interests of the child to be returned to him. Further such contact as he had with the child — a few cards and presents — do not show any sustained effort. Indeed, Dr. Sadler found that because Mr. G. holds himself blameless for his own and his family's difficulties, any treatment of his disorder would not be expected to rehabilitate him to a state where he could offer parenting care better than that already demonstrated by CT Page 11212 him. In addition, he never contacted the Department to inquire concerning the welfare of this child.
Elizabeth G. has made more efforts than her husband, although unavailing. She was unable to maintain a safe and clean home for this child, despite various services and assistance in doing so. She was unable to benefit from parenting classes or individual counseling to address the issues which led to the removal of her child including her inability to take action to protect this child. While her contact was sustained and she had regular and frequent visitation, the evidence is overwhelming that she cannot rehabilitate herself and it is not in this child's best interest to be returned to her home.
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. No inappropriate conduct is noted. It is the criminal behavior of the father which removed him from his daughter's life. The Department has taken many steps to encourage the mother to have a meaningful relationship with her child and to rehabilitate herself, which she has been unable to accomplish. The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year prior to the filing of the termination petition.
DISPOSITION
The court finds, based upon the testimony and evidence presented, that it is in Chloe's best interest to terminate the parental rights of Elizabeth G. and David G. This finding is made after considering this child's needs, the length of time she has been separated from her family of origin, her need for a secure and permanent environment, the relationship that she has with her foster parents, and the totality of circumstances surrounding her short and eventful life. This court is aware of the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." Inre Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OFTHE CHILD 99 (1979).
Based upon the foregoing findings, the court determines that CT Page 11213 it is in Chloe's best interest for a termination of parental rights to enter with respect to her parents, David and Elizabeth G. and it is hereby, ORDERED that the parental rights of Elizabeth and David G. are terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. If the foster parents continue to be willing to adopt Chloe, it is the court's direction that they receive first consideration. A permanency plan for Chloe shall be submitted within 90 days. A review plan for her shall be filed in accordance with state and federal Law.
Barbara M. Quinn, Judge Child Protection Session